CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
September 11, 2026
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **ARTHUR R. M.,** | ) | |
| **Plaintiff** | ) | |
| | ) | **Civil Action No. 7:25-cv-304** |
| v. | ) | |
| | ) | |
| **FRANK BISIGNANO, Commissioner** | ) | |
| **of Social Security,** | ) | **By: Michael F. Urbanski** |
| | ) | **Senior United States District Judge** |
| **Defendant** | ) | |

## MEMORANDUM OPINION

This social security disability appeal was referred to the Honorable C. Kailani Memmer, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), for proposed findings of fact and a recommended disposition. The magistrate judge filed a report and recommendation (R&R) on August 5, 2026, recommending that the court affirm the Commissioner's final decision and dismiss the case from the court's active docket. ECF No. 18. Plaintiff Arthur R. M. (Arthur) has filed objections to the R&R. ECF No. 19. Because the court cannot ascertain whether or how the administrative law judge (ALJ) reconciled Arthur's limited abilities to read, write, and do arithmetic with the representative jobs he found Arthur could perform, the court finds that the Commissioner did not meet his burden of proof on Step 5 of the sequential evaluation. Therefore, the ALJ's determination that Arthur is not disabled is not supported by substantial evidence and the court **REJECTS in part** the R&R, ECF No. 18, and **REMANDS** this case for further development by the Commissioner.

## I. Legal Standards

### A. Objections to Magistrate Judge's Report and Recommendation

The objection requirement set forth in Rule 72(b) of the Federal Rules of Civil Procedure[1] is designed to "train[ ] the attention of both the district court and the court of appeals upon only those issues that remain in dispute after the magistrate judge has made findings and recommendations." United States v. Midgette, 478 F.3d 616, 621 (4th Cir. 2007) (citing Thomas v. Arn, 474 U.S. 140, 147–48 (1985)). An objecting party must do so "with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." Id. at 622. The district court must determine de novo any portion of the magistrate judge's report and recommendation to which a proper objection has been made. "The district court may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1).

If, however, a party "'makes general or conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations,'" de novo review is not required. Diprospero v. Colvin, No. 5:13-cv-00088-FDW-DSC, 2014 WL 1669806, at *1 (W.D.N.C. Apr. 28, 2014) (quoting Howard Yellow Cabs, Inc. v. United States, 987 F. Supp. 469, 474 (W.D.N.C. 1997) and Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982)). "The district court is required to review de novo only those portions of the report to which specific objections have been made." Roach v. Gates, 417 F. App'x 313, 314 (4th

[1] "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b).

Cir. 2011) (per curiam). See also Midgette, 478 F.3d at 621 ("Section 636(b)(1) does not countenance a form of generalized objection to cover all issues addressed by the magistrate judge; it contemplates that a party's objection to a magistrate judge's report be specific and particularized, as the statute directs the district court to review only 'those portions of the report or specified proposed findings or recommendations to which objection is made.'"). Such general objections "have the same effect as a failure to object, or as a waiver of such objection." Moon v. BWX Technologies, 742 F. Supp. 2d 827, 829 (W.D. Va. 2010), aff'd, 498 F. App'x 268 (4th Cir. 2012). See also Arn, 474 U.S. at 154 ("[T]he statute does not require the judge to review an issue de novo if no objections are filed. . ..")

Nevertheless, as the court clarified in Elijah v. Dunbar, 66 F.4th 454, 460 (4th Cir. 2023), "objections need not be novel to be sufficiently specific."

> In Martin v. Duffy, 858 F.3d 239, 245–46 (4th Cir. 2017), this Court exemplified the specificity analysis by looking solely to whether the grounds for objection were clear. There, an objection which merely "restated all of [the] claims" was sufficiently specific because it "alerted the district court that [the litigant] believed the magistrate judge erred in recommending dismissal of those claims." Id. at 246. If the grounds for objection are clear, district court judges must consider them de novo, or else run afoul of both § 636(b)(1) and Article III.

If a litigant could not restate his argument to the district judge, in addition to "needlessly curtailing litigants' access to an Article III judge, such a requirement could leave litigants with no available arguments, as district court judges are not required to consider new arguments posed in objections to the magistrate's recommendation." Id. at n.4.

**B. Standard of Review of Commissioner's Decision**

Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet his burden of proving disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). In so doing, the court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner." Drumgold v. Comm'r of Soc. Sec., 144 F.4th 596, 605 (4th Cir. 2025) (citation modified).

Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401; Laws, 368 F.2d at 642. "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401. However, even under this deferential standard, a court does not "'reflexively rubber-stamp an ALJ's findings.'" Arakas v. Comm'r Soc. Sec. Admin., 983 F.3d 83, 95 (4th Cir. 2020) (quoting Lewis

v. Berryhill, 858 F.3d 858, 870 (4th Cir. 2017)). An ALJ must not only examine all relevant evidence but also must offer a sufficient rationale for crediting certain evidence and discrediting other evidence. Drumgold, 144 F.4th at 605. "To pass muster, ALJs must 'build an accurate and logical bridge' from the evidence to their conclusions.'" Arakas, 983 F.3d at 95 (citing Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) and quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)).

## II. Discussion

The ALJ in this case found that Arthur has a severe impairment of "intellectual disability," but the parties disagree as to whether the impairment causes Arthur to be disabled under the Social Security regulations.

### A. Claim History

Arthur filed his initial claim in 2015 alleging disability beginning July 1, 2003.[2] That claim was denied at all administrative levels and Arthur appealed to this district court. See Arthur M. v. O'Malley, No. 7:20-cv-00293 (W.D. Va. filed May 21, 2020) (Case No. 7:20-cv-00293). On August 23, 2021, this court adopted an R&R filed by the United States Magistrate Judge in which it was recommended that Arthur's case be remanded to the Commissioner of Social Security for further development. Order, ECF No. 23 in Case No. 7:20-cv-00293. The magistrate judge had concluded that substantial evidence did not support the ALJ's finding that Arthur did not meet a listing for intellectual disability and also concluded that there was an apparent conflict between the testimony of the vocational expert (VE) at the hearing and

[2] Arthur has applied for Disability Insurance Benefits and his date last insured is September 30, 2008. As he alleged disability beginning on July 1, 2003, he must show that he became disabled between those two dates.

the Dictionary of Occupational Titles (DOT) which was never explained. R&R, ECF No. 22 in Case No. 7:20-cv-00293.

On remand, the Appeals Council directed that a second ALJ take any action needed to complete the administrative record and issue a new decision. R. 2475. The second ALJ held a hearing and on March 16, 2024, issued a determination that Arthur is not disabled. Arthur sought review of the determination by the Appeals Council and when the Appeals Council denied relief, this lawsuit followed. On August 19, 2026, the magistrate judge issued an R&R finding that the ALJ decision that Arthur is not disabled is supported by substantial evidence and that the ALJ applied the correct legal standards. R&R, ECF No. 18.

Arthur now objects to the findings by the magistrate judge and makes the following arguments: (1) The ALJ improperly assessed Arthur's subjective allegations; (2) The ALJ erred when he concluded that Arthur's prior work was not sheltered or performed with accommodations for his intellectual disability; (3) The ALJ failed to properly review the medical evidence in the record; (4) the ALJ failed to properly review the opinion evidence in the record; (5) the ALJ erred in his assessment of Arthur's residual functional capacity (RFC); and (6) the ALJ erred when he concluded that Arthur's intellectual impairment does not meet or equal a listed impairment.

The court has reviewed these arguments and finds that the ALJ failed to properly review the evidence in the record and failed to include documented, uncontested limitations in the hypothetical question he presented to the VE, as well as in his assessment of Arthur's RFC. More specifically, the ALJ failed to explain how he reconciled the evidence of Arthur's extremely limited reading, writing, and arithmetic skills with his finding that work exists for

Arthur in the national economy, leaving the court to guess at how the ALJ reached his conclusion.[3] See Mascio v. Colvin, 780 F.3d 632, 637 (4th Cir. 2015) (remanding where court was "left to guess" at how the ALJ arrived at his conclusions regarding claimant's ability to perform relevant functions).

**B. Relevant Evidence**

**(1) School Records**

Arthur's school records indicate that he dropped out of school in the seventh grade at age 15. Testing showed that he functioned within the "intellectual range of mild mental retardation with an IQ equivalent of 67 points." R. 337.[4] Testing further showed that he appeared to possess adequate skills in verbal alertness, perceptual organization, foresight, and nonverbal reasoning abilities. R. 338. It was recommended that he be placed in classes for the "educable mentally retarded." R. 338–39. That recommendation was repeated over the years. R. 263, 273, 282, 361, 349, 333, 335. Testing when Arthur was 13 and in the seventh grade showed he was performing arithmetic between a second and third grade level and was reading between a first and second grade level. R. 346–50. When he was 14, an educational evaluation report assessed his mental age as between 8 and 9 years old with an IQ of 59. He was reading, spelling, and doing arithmetic at a first grade level. R. 334. Testing when Arthur was 15 showed

[3] Although Arthur challenged the adequacy of the ALJ's RFC determination, he did not raise this particular issue. However, while the Federal Magistrates Act, 28 U.S.C. § 636, does not require a district judge to review an issue de novo if no objections are filed, "it does not preclude further review by the district judge sua sponte or at the request of a party, under a de novo or any other standard." Thomas v. Arn, 474 U.S. 140, 154 (1985).

[4] Effective September 3, 2013, the Social Security Administration replaced the term "mental retardation" with the term "intellectual disability." Kiser v. Saul, 821 F. App'x 211, 213 n.2 (4th Cir. 2020). The change in terminology did not change the substance of any regulation and did not affect how the Social Security Administration evaluates a claim based on intellectual disability, or intellectual disorder. Id. The court here uses the term "mental retardation" only when citing to Arthur's school records, which were generated during the late 1970s and early 1980s, and in quoting a report by the consultative psychologist.

he was reading and spelling on a first grade level, could not write a complete sentence or paragraph using correct grammar and punctuation, could not develop or express a written idea, and could not follow written directions. His arithmetic skills were assessed at a second grade level. He could add at all levels and subtract numbers "at all levels sometimes," had a minimal ability to do multiplication, and could not do division. He was described as immature, easily frustrated, and very child-like and innocent. R. 305–10.

**(2) Medical Evidence**

The only medical evidence in the record related to Arthur's intellectual disability is a report from a consultative psychologist, Jeffrey Luckett, Ph.D. Dr. Luckett evaluated Arthur in 2014. He noted that Arthur completed the seventh grade but had repeated two or three separate grades. Arthur never attempted to obtain a GED. He could read three- and four-letter words and could sign his name and write his address. He did not have a checking account but had a savings account. R. 365. Arthur's sister drove him to the appointment. Arthur had always lived with his parents and continued to live with his mother after his father died. His mother had advanced Parkinson's disease. Id.

Arthur's mental status examination showed him to be oriented as to the month, date of the month, and the year, but not to the day of the week, reporting it to be Tuesday instead of Monday. He spent his days helping his mother and feeding six or seven chickens and his dog. He had no friends outside the family and no romantic interest. He had an active driver's license, which he obtained by taking an oral test. He was described as pleasant and positive. R. 366.

Testing showed that Arthur fell into the "mentally deficient" range of intellectual abilities encompassing scores of 69 and below. His use of judgment, logic, and reasoning were below average and he had difficulty with mental reasoning. His sister reported that Arthur was terminated from his job as a janitor at a school because he hugged some of the girls at the school. Id.[5]

Testing utilizing the Weschler Adult Intelligence Scale revealed that Arthur tested in the 1st percentile in verbal comprehension, working memory, and full-scale IQ, placing him in the mentally deficient range of intellectual abilities; in the 3rd percentile for processing speed, placing him in the borderline range; and in the 5th percentile for perceptual reasoning, placing him in the borderline range of intellectual functioning. R. 367. The Wide Range Achievement Test measured Arthur's reading and arithmetic skills at the second grade level and his spelling skills at the first grade level. R. 368. Dr. Luckett stated that Arthur should not be considered capable of making his own financial decisions in his own best interests due to his lower IQ abilities. R. 369.

Dr. Luckett noted that in regard to employment, Arthur had been able to hold three jobs for some length of time. He had worked at a grocery store for three or four years due to the benevolence of the manager, but once the manager left, Arthur was terminated by the new manager. In addition, he worked as a busboy for many years and obtained a driver's license via an oral exam. Dr. Luckett concluded that Arthur had some abilities "beyond strictly looking at his Full Scale IQ" but nevertheless concluded that he was functioning within a "mentally

[5] At his 2024 hearing, Arthur attributed his termination to a conflict with the principal and denied that he hugged a student. R. 2529.

deficient – mild mental retardation range." Id. He could perform simple and repetitive tasks, but not more complex job requirements. He could not work well with the general public but could work with peers and supervisors appropriately. He could not live independently given his cognitive status, with the chief concerns being his low logic and reasoning abilities, not being able to handle money well, and not understanding concepts well. Id.

**(3) Expert Medical Opinion**

A psychiatric expert, Coleman Cosgrove, D.O., did not examine Arthur, but reviewed the records related to his intellectual disability and testified at Arthur's 2024 hearing. Dr. Cosgrove opined that Arthur would be capable of work involving simple and routine tasks with only occasional public contact. R. 2537–38. He based his assessment on Arthur's limitations in understanding and memory, adaptation, concentration, and socialization. R. 2538. Arthur would be able to travel within his community without assistance. Id. He would be able to read labels like those on cleaning solutions and could sort things like nuts and bolts. R. 2538–39. Reading full sentences would be very challenging for him and he could not read paragraphs. R. 2543. In Dr. Cosgrove's opinion, Arthur would be limited to jobs involving one- to two-step instructions and would be precluded from more complicated jobs. R. 2539. He could make simple work-related decisions and could handle few to minimal changes in the workplace. He would need a consistent schedule and limited variety in work-related duties and tasks. R. 2540. Dr. Cosgrove offered his opinion within a reasonable degree of medical certainty. R. 2540, 2543.

**(4) Arthur's Testimony**

At his 2018 hearing, Arthur testified that he could read and write "a little bit," could read enough to get things at the grocery store, could "maybe" read three or four-letter words, could not read a newspaper, and could not read the "hard words" in a letter from the Social Security Administration. He passed the driver's license test, which was administered orally. R. 37. He could not write a letter and could not read cursive writing. R. 56. When he shopped for his mother at the grocery store, a lot of what he got he knew "by heart." R. 56–58. He was unable to fill out any paperwork by himself. R. 59–60. At the grocery store he sometimes had to ask for help reading the list his mother gave him. R. 62.

Arthur drove but was limited to driving to familiar places. He did not pay attention to street names in unfamiliar locations, but he could read signs indicating danger or road work. R. 38. He had prior work as a busboy, a janitor, and as a supermarket "cleanup boy," where he took out the trash and cleaned the meat department. The same friend helped him get the busboy job and the supermarket job and when that friend left the supermarket, Arthur was terminated. R. 40–41. Part of his duties included cleaning a meat cutter, which he had to disassemble. He said it was not complicated to disassemble the appliance, but he had to do it carefully because it was dangerous. He learned how to do the job from an oral explanation and demonstration, and he also taught himself some of the job. R. 41–42, 52. When he worked as a busboy and as a janitor, his employers were always trying to get him to work faster and get more done. R. 55–56.

When he worked as a janitor he was taught to strip and wax the floors and he was able to do it by himself "after they trained [him] for a while." R. 44. He was not allowed to have a

key to the supply closet and if he needed anything he had to ask another employee to get it for him. Id. He said he was terminated from that job after he pulled a muscle and was out for a few days. His manager called and said he was going to terminate Arthur, who "got mad and [ran] his mouth." R. 46. Although Arthur returned to the position, he did not pursue another contract. R. 44–46. Arthur testified that while friends helped him obtain all the jobs he has held, he did not receive extra help at any of the jobs "that he knew of." R. 47, 48–49, 52–53, 55. Arthur testified that he was taking care of his mother, who had Parkinson's disease, but he did not describe the care he provided. R. 51.

At the 2024 hearing, Arthur reiterated much of the testimony he gave in 2018. In addition, he testified that when he worked as a busboy, after he was trained he could do the work without additional supervision. If he saw that a table needed cleaning, he would do it without anyone having to tell him to do so. R. 2515–16. He left that job after he became distracted helping a customer in a wheelchair who asked for assistance, causing Arthur to fall behind in his busboy duties. When a coworker failed to help Arthur get caught up with his work, Arthur "didn't go back to work no more after that." R. 2520.

When he worked as a school janitor, he was trained to strip and wax the floors, and then he had to do it on his own "for a while," R. 2517, but also said that "you got to have three people to do that." Arthur explained the multiple steps involved in stripping and waxing the floors, and the various products they used. R. 2518–19. He did not read the labels on the products, but he "just knew which one to get because [he] look[ed] at the other buckets pretty much." R. 2519, 2529–30.

Arthur believes that he would be able to follow a detour sign when driving by looking at the pictures. R. 2524, 2527. He drove himself to the store but he did not drive far from home because while he could probably do it, he would rather have somebody else drive. He gets lost if he goes to a new place, but he tries to backtrack until he recognizes something familiar. R. 2524, 2532.

When he shops at the grocery store, he uses cash, but he does not count his change. He just assumes that the clerk gives him the correct change, although he sometimes can count change, depending on how much it is. R. 2526. He can find items in the store by both reading the container and looking at the picture. R. 2525, 2527.

Arthur testified that he cannot read well enough to fill out a form and his mother or his sister helped him do that. He also said that he was not "smart enough" pay bills or handle a checking or savings account. R. 2532. He could not write a letter relaying any information about his mother or sister. R. 2533.

**C. Step Five of the Sequential Evaluation**

When assessing an application for disability benefits, an ALJ makes a series of determinations: (1) Whether the claimant is engaged in substantial gainful activity; (2) Whether the claimant has a medically determinable impairment that is "severe" under the regulations; (3) Whether the severe impairment or combination of impairments meets or medically equals the criteria of a listed impairment; (4) Whether the claimant has the residual functional capacity to perform his past relevant work; and (5) Whether the claimant is able to do any other work in the national economy, considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a). If the ALJ finds that the claimant has been engaged in substantial gainful

activity at Step 1 or finds that the impairments are not severe at Step 2, the process ends with a finding of "not disabled." Mascio, 780 F.3d at 634-35. At Step 3, if the ALJ finds that the claimant's impairments meet or equal a listed impairment, the claimant will be found disabled. Id. at 635. If the analysis proceeds to Step 4 and the ALJ determines the claimant's RFC will allow him to return to his past relevant work, the claimant will be found "not disabled." If the claimant cannot return to his past relevant work, the ALJ then determines, often based on testimony from a vocational expert, whether other work exists for the claimant in the national economy. Id.

The claimant bears the burden of proof on the first four steps and the burden shifts to the Commissioner on the fifth step. Monroe, 826 F.3d at 178–79. "The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy." Kurley Ann J. v. Kijakazi, No. CV TMD 20-2341, 2021 WL 4750186, at *3 (D. Md. Oct. 12, 2021) (citing Walls v. Barnhart, 269 F.3d 287, 290 (4th Cir. 2002)).

To answer the fifth question, whether sufficient work exists for the claimant in the national economy, the ALJ relies primarily on the DOT. Pearson v. Colvin, 810 F.3d 204, 207 (4th Cir. 2015) (citing Soc. Sec. Admin., Policy Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions, Social Security Ruling 00–4p, 2000 WL 1898704, at *2 (Dec. 4, 2000)).[6]

[6] Effective January 6, 2025, the Social Security Administration rescinded SSR 00-4p and replaced it with SSR 24-3p, Titles II and XVI: Use of Occupational Information and Vocational Specialist and Vocational Expert Evidence in Disability Determinations and Decisions. However, SSR 00-4p was in effect at the time Arthur's claim was adjudicated and the court will look to that ruling it its review of the ALJ's decision.

An ALJ may also use a vocational expert "to address complex aspects of the employment determination, including the expert's observations of what a particular job requires in practice or the availability of given positions in the national economy." Id. (citation modified). Because the VE's testimony can conflict with the DOT, the ALJ must inquire on the record whether the VE's testimony conflicts with the DOT and elicit a reasonable explanation for and resolve conflicts between the VE's testimony and the DOT. Id. at 207–08. The ALJ has an affirmative duty to resolve the conflict by determining if the explanation is reasonable and must explain the resolution of the conflict irrespective of how the conflict was identified. Id. at 208 (citation modified). An ALJ does not fulfill the affirmative duty simply because the VE responds yes when asked if her testimony is consistent with the DOT. Id. (citation modified). "An ALJ has not fully developed the record if it contains an unresolved conflict between the expert's testimony and the Dictionary. Nor has the ALJ fulfilled this duty if he ignores an apparent conflict because the expert testified that no conflict existed." Id. at 210.

**(1) First ALJ Hearing and Determination**

At Arthur's first administrative hearing, the ALJ asked the VE to consider a person of the same age as Arthur, with his same education and work experience, and with no exertional limitations, who was able to carry out simple one- or two-step instructions and perform simple, repetitive tasks with occasional interaction with coworkers and supervisors, and no public interaction. His work would be directed and he would not make plans independently. He would have no reading, writing, or math requirements. He would not be working with money and he would be able to learn by demonstration. R. 68. The VE responded that such a person

could do Arthur's prior work, and could also work as a hand packager, laundry worker, or dishwasher. R. 69.

The ALJ asked the VE if her testimony was consistent with the DOT and she said it was, except that the DOT does not address the ability to handle routine changes. Her assessment of that information was based on her professional experience and research. The ALJ asked if "a reading, writing, and math requirement" was part of the DOT and the VE responded that it was. R. 70–71.

The ALJ determined that Arthur had the RFC to perform a full range of work at all exertional levels, but could understand, remember, and carry out only simple one- or two-step tasks and perform simple, routine, repetitive tasks. He could have occasional interaction with coworkers and supervisors but no interaction with the public. He could perform work that was directed but could not make plans independently. He could not perform work with any reading, writing, or math requirements and could not work with money. He could perform jobs in which he learned by demonstration. R. 20–21. The ALJ then concluded that Arthur could perform his past jobs of dining room attendant and floor maintenance worker, as well as the jobs of hand packer, laundry worker, or dishwasher, and therefore, was not disabled. R. 25–26.

In the court's previous order remanding this case to the Commissioner, it adopted the R&R of the magistrate judge, who recommended remand in part because of an unexplained conflict between the VE's testimony and the DOT. The ALJ relied on the testimony of the VE who found that Arthur could do the jobs listed, even though the jobs exceeded Arthur's RFC which limited him to jobs requiring no reading, writing, or math. R&R, ECF No. 22 at

13 in Case No. 7:20-cv-00293. The magistrate judge noted that the DOT listed the jobs described by the VE as involving math level one and language level one, except for the job of industrial cleaner which involved language level two. Id. Math level one requires the following:

> Add and subtract two digit numbers. Multiply and divide 10's and 100's by 2, 3, 4, 5. Perform the four basic arithmetic operations with coins as part of a dollar. Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound.

Language level one requires the following:

> Reading: Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute. Compare similarities and differences between words and between series of numbers.
>
> Writing: Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses.

R&R, ECF No. 22 at 13–14 in Case No. 7:20-cv-00293. These levels are set forth as part of the General Education Development (GED) standards in the DOT, which "embrace[] those aspects of education (formal and informal) which are required of the worker for satisfactory job performance."[7]

The magistrate judge found that because the ALJ determined that Arthur could not perform any work requiring reading, writing, or math, the jobs cited by the VE were inconsistent with the hypothetical. The magistrate judge recognized that level one is the lowest classification in the DOT and that a particular job may not require all of the level one skills, but the VE offered no explanation regarding the reading, writing, and arithmetic skills needed for the jobs cited. The magistrate judge concluded that the court could not assume that the

[7] https://occupationalinfo.org/appendxc_1.html

jobs the ALJ found that Arthur could do required no arithmetic, reading, or writing when the DOT stated that they did. Id. at 15. The magistrate judge recommended remand in part because substantial evidence did not support the ALJ's finding that jobs existed that Arthur could perform. Id. at 16. This court adopted that finding and remanded Arthur's case for further development.

**(2) Current ALJ Hearing and Determination**

At the 2024 ALJ hearing, the ALJ asked the VE to consider a younger individual with a marginal education and the same past work as Arthur. The person could understand, remember, and carry out only simple instructions. The person could use judgment to make simple work-related decisions, occasionally interact with coworkers and supervisors, but could not perform group or tandem tasks and could not interact with the general public. He could deal with only occasional changes in a routine work setting. R. 2545–46. The VE testified that such a person could do Arthur's previous composite job of janitor and floor cleaner. R. 2545–46. He could also do the jobs of floor cleaner, packager, or machine feeder, all of which are medium, unskilled jobs with an SVP of 2. R. 2546–47. If the person needed to have any changes to the job accompanied by oral instructions or with a short demonstration and training for up to thirty days, could not work with money, and could not travel as part of the job, he could still perform the jobs described, including Arthur's previous work as a janitor/floor cleaner. There was one job at the SVP of 1 that such a person could perform, which was that of a bus detailer or cleaner. R. 2547. If the person could occasionally interact with the public, he could do Arthur's previous work as a busboy. R. 2549.

The VE testified that jobs that are limited to one- to two-step instructions, as described by Dr. Cosgrove, are considered a sheltered type of job. She further testified that Arthur's previous jobs as busboy and janitor involved carrying out more than one- to two-step instructions. R. 2548.

The ALJ asked the VE if her testimony was consistent with the information found in the DOT and she said it was, with the exception of interaction with others, the need to handle money, to travel during work, or a limitation to one- or two-step instructions. She based her answers to those restrictions on her training and experience. R. 2548–49.

The ALJ assessed Arthur's RFC as being able to perform work at all exertional levels, with the following non-exertional limitations:

> [T]he claimant could understand, remember, and carry out simple instructions. He could use judgment to make simple, work-related decisions. The claimant could occasionally interact [with] coworkers, and supervisors, but could not perform group or tandem tasks, [and] could not interact with the general public. He could deal with occasional changes in a routine work setting, where changes [would] be accompanied by instructions that [were] provided orally, or with a short demonstration with an opportunity for training for up to but no more than thirty days. The claimant could not work with money as part of the job, and travel could not be part of work.

R. 2485. The ALJ then found that Arthur could not perform his past relevant work, but could do the jobs of floor cleaner, packager, machine feeder, and bus detailer. Because these jobs exist in significant numbers in the national economy, the ALJ found that Arthur was not disabled. R. 2495.

Notably, the ALJ did not include a restriction of no reading, writing, or arithmetic in the hypothetical question he presented to the VE or in the RFC assessment. The ALJ pointed

out that the court's previous opinion referenced GED levels regarding reading but stated that "the Agency does not consider GED aptitudes, work situations, or work functions." R. 2492 (citing EM-21065).[8] While that is true, it does not mean that the ALJ should not include limitations in a claimant's ability to read, write, and do arithmetic in a hypothetical question to a VE, as that information is relevant to the VE's testimony as to available jobs. See Haywood v. Kijakazi, No. 3:22-cv-449-MOC, 2023 WL 4919685, at *5 (W.D.N.C. Aug. 1, 2023) (remanding where ALJ did not provide information regarding claimant's fourth grade reading abilities and third grade spelling abilities to the VE); and Springer v. Berryhill, No. 1:16-CV-150, 2017 WL 3447920, at *16 (N.D.W.V. July 25, 2017) (remanding in part because ALJ did not obtain testimony from VE as to whether claimant, who read at a third grade level and wrote at a second grade level, could read well enough to perform the job cited by the VE, which had an SVP of 2, and reasoning, math, and language levels of 1); see also Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (noting that the purpose of bringing in a VE is to assist the ALJ in determining whether there is work available in the national economy for the particular claimant to perform and that in order for the VE's opinion to be relevant or helpful, it must be based upon a proper hypothetical question which fairly sets out all of the claimant's impairments).

The court notes that the ALJ stated that a numerical score, without more, is not a limitation, and that the years of Arthur's functioning, along with his ability to obtain a driver's

[8] "EM-21065" refers to Emergency Message 21065 which was in effect from December 5, 2023, through January 6, 2025, when a revised Emergency Message took effect. The emergency messages provide "guidance for policy-compliant use of occupational information from Digital Library electronic tools." EM-21065 stated that the SSA did not consider GED ratings because they did not correspond to the Social Security Administration's regulatory definitions of unskilled, semiskilled, and skilled work. https://secure.ssa.gov/apps10/referencearchive.nsf/links/10292021113305AMREV

license and drive a car, indicate that he had an ability to understand, remember, and apply information. In addition, he found that Arthur's demonstrated abilities in prior work provided further evidence that he could learn new activities and follow instructions on an independent and unassisted basis. The ALJ stated that Arthur's testimony showed that while his work in the grocery store may have been provided by a friend, Arthur was able to perform the job for which he was hired. R. 2490–91.

While that assessment has a basis in the record, it does not address the issue of whether someone who reads and does arithmetic at a second grade level and spells at a first grade level can do the jobs cited by the ALJ. Accordingly, the court finds that the ALJ did not fulfill his affirmative duty at Step 5 of the sequential evaluation because the question of whether Arthur can do the jobs cited by the VE and the ALJ given his limited academic abilities remains unanswered. The ALJ should have provided the information regarding Arthur's well-documented limitations to the VE for her consideration in calculating the number of jobs available in the national economy that Arthur could perform. The ALJ's failure to do so leaves the court to guess about whether Arthur's extremely limited ability to read, write, and do arithmetic would affect his ability to perform the jobs cited by the VE. Accordingly, the Commissioner's Step 5 determination is not supported by substantial evidence and this case must be remanded for further development.

Because the court has determined that the Commissioner did not meet his burden of proof at Step 5 of the sequential evaluation, the court does not consider Arthur's additional objections. Regardless, the Commissioner should address the other issues raised on remand. Carmen F. v. Bisignano, No. AAQ-25-0001, 2026 WL 770056, at *6 (D. Md. Mar. 19, 2026)

(citing Tanner v. Comm'r of Soc. Sec. 602 F. App'x 95, 98 n.1 (4th Cir. 2015) (per curiam)) (remanding on other grounds and declining to address claimant's additional arguments).

### III. Conclusion

For the reasons stated, the court **REJECTS in part** the R&R, ECF No. 18, **SUSTAINS in part** the objections filed in this case, ECF No. 19, and **VACATES** the determination of non-disability made by the Commissioner. The court **REMANDS** this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this opinion. This matter is **DISMISSED** and **STRICKEN** from the active docket of the court.

An appropriate Order will be entered.

It is so **ORDERED**.

Entered: Sept. 10, 2026

Michael F. Urbanski
Senior United States District Judge